**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TTEC GOVERNMENT SOLUTIONS LLC,<br>Plaintiff,<br>-against-<br>CONDUENT INCORPORATED,<br>Defendant. | 26 Civ. __________ ( )<br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff TTEC Government Solutions, LLC ("TTEC"), by and through its undersigned attorneys, hereby brings this Complaint against Defendant Conduent Incorporated ("Conduent") and alleges as follows:

**INTRODUCTION**

1. Historically, Conduent held the contract to operate all aspects of the New York Customer Service Center ("NYCSC") with the Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels), the New York State Thruway Authority, and the Port Authority of New York and New Jersey (collectively the "Agencies" or the "NY Tolling Authorities"). Conduent operated both the "front facing" customer service center and the "back office" management system. In or around 2018, the Agencies decided to move the front facing aspects of NYCSC to a company other than Conduent because Conduent's systems were inefficient and outdated and there was a lack of transparency from Conduent. On or about August 25, 2022, TTEC took over the front-facing customer service center.

2. Unfortunately, an aggrieved Conduent has done everything in its power to prevent TTEC from successfully executing its front-office operations contract with the Agencies. As discussed in greater detail below, TTEC's front-office operations are entirely dependent on

Conduent's back-office systems, which have been riddled with issues. For instance, Conduent has missed rollout deadlines for back-office systems, and when it finally rolled those systems out, they contained errors, defects, and deficiencies.

3. Despite these challenges, TTEC has worked tirelessly to mitigate operational disruptions, prevent unnecessary delays or diminution of services caused by Conduent, cooperate with Conduent to engender improvements to NYCSC for customers, and reach an out of court settlement to resolve its dispute with Conduent amicably.

4. In return, Conduent has denied responsibility, stalled meetings and improvements, and most egregiously, attempted to pass the buck to TTEC by contacting the Agencies and falsely claiming that TTEC has and continues to be responsible for the NYCSC program shortcomings. As a result, the Agencies have given TTEC adverse performance reviews, assessed penalties against TTEC, and have not been able to properly mediate the disputes between TTEC and Conduent, as they are required to do under their separate contracts with each of the two companies.

5. As discussed in greater detail below, Conduent recently announced that it had entered into an agreement to sell its tolling business to Quarterhill, Inc. ("Quarterhill") for $70 million (the "Quarterhill Sale"). That sale is expected to close before the end of this year. Upon information and belief, Conduent has been flouting its NYCSC obligations and stalling TTEC's efforts to collaborate and cooperate because it hopes that, soon, the Quarterhill Sale will close and it will be free of any NYCSC obligations.

6. However, as a direct and proximate result of Conduent's actions, as of June 2026, TTEC has suffered extensive, direct damages totaling over $10 million, as well as other types of damage including but not limited to reputational harm and loss of goodwill. TTEC will continue to incur damages, reputational harm, and loss of goodwill until its claims against Conduent are

resolved. And once the Quarterhill Sale closes, TTEC will be stripped of its ability to recover against Conduent, necessitating the prompt preservation of its rights through the instant lawsuit.

## PARTIES

7. Plaintiff TTEC Government Solutions, LLC is a limited liability company organized under the laws of the State of Colorado, with its principal place of business at 100 Congress Avenue, Suite #1425, Austin, TX 78701. TTEC is a leading provider of customer care and support services to various public-sector clients throughout the United States, including the State of New York. TTEC is not a citizen of the state of New York.

8. Defendant Conduent Incorporated is a corporation organized under the laws of the State of New Jersey, with its principal place of business at 7925 South Park Place, Orlando, Florida 32819. Conduent is a technology services company that, as relevant here, operates back-office tolling and transaction-processing systems for public-sector clients throughout the United States.

9. Non-parties the Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels), the New York State Thruway Authority, and the Port Authority of New York and New Jersey, are the public entities that administer the NYCSC program and hold contracts with both TTEC and Conduent for separate services.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff TTEC is a citizen of Colorado and Texas. Defendant Conduent is a citizen of New Jersey and Florida.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. The NYCSC

program serves New York-area toll-road customers, the Agencies are headquartered in New York, and the contracts at issue govern operations performed principally within the Southern District of New York.

## FACTUAL ALLEGATIONS

### *A. The NYCSC Program and the Parties' Roles*

12. The NYCSC program provides customer-care and back-office services for electronic toll-collection customers of the NY Tolling Authorities. The program serves millions of E-ZPass, Toll-by-Mail, and congestion-pricing customers across bridges, tunnels, and highways in the New York metropolitan area.

13. Under the Customer Contact Center Agreement, Contract No. PSC-15-2982XA, together with related Authority agreements Contract Nos. C010591 and 4600025342 (collectively, the "Agreement"), TTEC holds the front-office customer service contract with the Agencies. TTEC operates the public-facing components of the NYCSC, including the customer call center, live-chat agents, IVR contact-center platform, quality systems, workforce management, reporting, and the direct interface with toll customers.

14. Under a separate contract with the same Agencies, Conduent holds the back-office contract and operates the "Vector Successor System" (the "Vector System"), which encompasses the core back-office system, CRM, ERP, financial-transaction processing, DMV integrations, the customer website, mobile application, transponder ordering and delivery, billing, statement generation, and customer-service chatbots.

15. TTEC's ability to serve NYCSC customers is entirely dependent on the adequate functioning of the Vector System administered by Conduent. The two contractors' operations are

inextricably linked: when Conduent's back-office system fails, TTEC's front-office operations bear the direct and immediate consequences.

***B. The Harmony Clause (Article 2.05)***

16. Both TTEC's contract and Conduent's contract with the Agencies contain what is commonly known as the "Harmony Clause." That provision, Article 2.05(d) in both the Agreement and in Conduent's agreement with the Agencies, provides:

> *"Each contractor shall be responsible to the other for all damage to work, to persons or property caused to the other by their operations, and for loss caused the other due to unnecessary delays or failure to finish the Work within the time specified for completion."*

17. The Harmony Clause expressly creates reciprocal obligations between Conduent and TTEC as co-contractors on the NYCSC program. It was specifically designed to ensure that each contractor bears responsibility for any harm its operations cause to the other contractor.

***C. Conduent's History and the Transition to TTEC***

18. Conduent previously held the entire NYCSC contract, including both front-office and back-office processes. The Agencies elected to move front-facing operations away from Conduent in 2018 because Conduent's systems were inefficient and outdated, lacked transparency, and delivered substandard customer service.

19. In 2021, the Agencies awarded the front-facing customer service contract to Faneuil, Inc ("Faneuil"). On or about August 25, 2022, Faneuil assigned its rights and obligations under that contract to TTEC.

20. The original implementation date or "Go-Live Date" ("go-live") to serve New York toll-road customers for the Vector System was January 29, 2024. TTEC's customer service platform was ready by that date. Conduent's Vector System was not. Conduent's failure to deliver the Vector System on time delayed the program's rollout by more than one year.

21. During the workaround period from approximately February 3, 2024, to April 15, 2025, TTEC was forced to operate on Conduent's outdated legacy system because Conduent could not deliver its replacement, as it was contractually obligated to do.

### *D. The Vector System Goes Live — Pervasive and Persistent Defects*

22. Conduent's Vector System finally went live on April 15, 2025. Almost immediately, the system was plagued by pervasive defects that far exceeded any reasonable post-implementation expectations. These defects have persisted continuously since go-live and remain substantially unresolved.

23. The Vector System's known defects include, but are not limited to: (a) billing errors, including E-ZPass transactions being mis-posted to Toll-by-Mail accounts, resulting in customer overcharges; (b) chronic transponder and tag delivery failures; (c) customer-service chatbots that cannot handle even basic prompts, pushing inquiries to TTEC's live agents; (d) violation notices erroneously reflecting thousands of dollars in tolls; (e) incorrect congestion-pricing assessments; (f) failure to process customer toll payments, placing accounts in delinquency; (g) data that was not properly migrated and remains inaccessible or unreliable; and (h) incorrect issuance of vehicle tags to motorcycle applicants.

24. The system has also experienced recurring platform outages, transactional data accuracy failures, customer mailing delays, and missed resolution timelines. As of the filing of this Complaint, over 1,000 DevOps tickets remain open, with approximately 600 classified as Critical.[1] There has been no meaningful burndown improvement since the Vector System's go-live.

[1] DevOps tickets are electronic logs that are submitted to Conduent when an issue with Conduent's Vector System, website, or mobile app is identified. A DevOps ticket is left "open" until the issue is resolved. "Critical" DevOps tickets are issues whose resolution is expected to be prioritized and expedited because these issues have a greater impact on NYCSC customers.

25. Hundreds of thousands of customers have been unable to use IVR self-service since August 2025 due to Conduent API socket timeouts.[2] This failure has forced hundreds of thousands of additional calls to TTEC's live agents.

***E. Operational Impact on TTEC***

26. The Vector System's failures have had a material and devastating impact on TTEC's operations. Call volumes have exceeded forecasts by approximately 160%. In February 2026 alone, TTEC received hundreds of thousands of calls — an approximately 54% increase over forecast.

27. Because of the unnaturally high call volumes caused by the Vector System's errors, TTEC's case backlog exceeded hundreds of thousands of cases by November 6, 2025. Between May 8 and August 8, 2025, TTEC opened hundreds (or more) DevOps tickets identifying Vector System defects, in addition to 130 prior punch-list items.

28. Because of the overwhelming number of problems with Conduent's systems, TTEC personnel have continually been forced to incur thousands of man-hours in an attempt to help Conduent solve its problems. TTEC personnel have routinely been required to attend daily Conduent "SWAT team" meetings lasting several hours. Containment rates[3] fell to approximately 48% against a 70% target, with the 22-percentage-point miss directly attributable to Conduent's defects.

---

[2] When a customer calls the NYCSC, they will be initially directed to an IVR self-service, which is an automated system relying on artificial intelligence to intake and potentially resolve a customer's inquiry, instead of a live agent. TTEC administers the IVR self-service for the NYCSC, but this service relies on data relating to the customer from Conduent's Vector System to work properly. When the IVR self-service system is unable to obtain this data the Vector System, as is the case here, the IVR self-service system cannot handle the customer's inquiry, and the customer's call will be directed to a TTEC live agent.

[3] "Containment rates" is a metric that is meant to measure how effectively TTEC and Conduent's systems are resolving customers' concerns without a live agent's involvement.

29. TTEC has been forced to staff an average of at least 940 full-time equivalent employees against an original target of 430 — more than double the planned workforce — solely to manage the consequences of Conduent's system failures. This has had dire financial repercussions for TTEC.

### *F. TTEC's Harmony Clause Claims and Conduent's Refusal to Pay*

30. On November 20, 2025, TTEC submitted its first Harmony Clause claim to Conduent for hundreds of thousands of dollars in correspondence backlog costs.

31. On December 1, 2025, TTEC submitted a comprehensive Harmony Clause claim to Conduent for millions of dollars in costs incurred and projected from April 2025 through March 2026.

32. On January 13, 2026, the Agencies issued a formal Endorsement Letter concurring with TTEC's claims against Conduent. The Agencies confirmed that, under Article 2.05(d), "[e]ach contractor shall be responsible to the other for all damage to work . . . caused to the other by their operations, and for loss caused the other due to unnecessary delays or failure to finish the Work within the time specified for completion." The Agencies directed Conduent to negotiate an equitable resolution with TTEC.[4]

33. Despite the Agencies' endorsement and direction, Conduent engaged in a pattern of delay and deflection. TTEC and Conduent attended multiple meetings between December 2025 and March 2026. At a meeting in or around February 23, 2026, Conduent promised a resolution "within a week." Conduent failed to provide any substantive response until April 9, 2026.

34. On April 9, 2026, Conduent issued a formal denial, calling TTEC's documented claims "baseless" and refusing to reimburse any amount.

---

[4] The Agencies' January 13, 2026 formal Endorsement Letter is attached hereto as Exhibit A.

35. On May 12, 2026, TTEC submitted an updated Harmony Clause claim to Conduent reflecting millions of more dollars in actual costs through March 31, 2026. This amount continues to accrue every day.

36. As of June 2026, TTEC has absorbed over $10 million in damages caused directly by Conduent's system failures.

37. To date, Conduent has refused to pay TTEC's claims. TTEC's losses continue to accrue.

### *G. Conduent Has Delayed Resolution of TTEC's Claims Due to a Pending $70 million Sale of Conduent's Tolling Business to Quarterhill, Inc.*

38. Since Conduent issued a formal denial of TTEC's Harmony Claim on April 9, 2026, TTEC has endeavored to amicably resolve its claims against Conduent.

39. TTEC and Conduent executives have engaged in several discussions concerning an out-of-court resolution of TTEC's claims. Nonetheless, no resolution has been achieved.

40. Conduent has agreed to multiple deadlines to provide TTEC with a reasonable settlement offer. Conduent has missed every single one of these deadlines.

41. On June 30, 2026, Conduent announced that it had entered into an agreement to sell its tolling business to Quarterhill for $70 million (i.e., the Quarterhill Sale). According to Conduent, "this transaction is expected to close before the end of 2026."[5]

42. Upon information and belief, Conduent's involvement with NYCSC will cease following the completion of the Quarterhill Sale and Quarterhill will assume all of Conduent's responsibilities relating to NYCSC, but not its liabilities arising out of Conduent's NYCSC operations.

[5] *Conduent Announces Agreement to Sell Its Tolling Business to Quarterhill Inc. for $70 Million*, CONDUENT, https://www.news.conduent.com/news/conduent-announces-agreement-to-sell-its-tolling-business-to-quarterhill-inc-for-70-million (June 30, 2026).

43. In light of Conduent's failure to meet any of its settlement offer deadlines and the pending Quarterhill Sale, TTEC believes that Conduent has been engaging in settlement discussions with TTEC solely to delay litigation or resolution of TTEC's claims before the Quarterhill Sale's completion.

44. Upon information and belief, when the Quarterhill Sale closes, TTEC will be unable to pursue its claims against Conduent, necessitating the filing of the instant lawsuit.

## COUNT I

### Breach of Contract to Which TTEC is an Intended Third-Party Beneficiary

45. TTEC repeats and realleges each and every allegation set forth above as if fully set forth herein.

46. The Agencies entered into a valid and binding contract with Conduent, requiring Conduent to, among other things, establish the Vector System by a date certain and thereafter maintain it. That contract also contains the Harmony Clause (Article 2.05). Under Article 2.05(d), Conduent assumed an express obligation to be "responsible to the other [contractor]" — i.e., TTEC — "for all damage to work, to persons or property caused to the other by their operations, and for loss caused the other due to unnecessary delays or failure to finish the Work within the time specified for completion."

47. Under New York law, TTEC has standing to enforce the Harmony Clause as a third-party beneficiary because: (a) the Agencies' contract with Conduent manifests a clear intent to permit enforcement by the co-contractor; (b) TTEC's right to recover depends upon the Harmony Clause as the basis for recovery; and (c) the contract terms demonstrate that the parties intended to give TTEC the benefit of Conduent's promised performance.

48. TTEC is an intended third-party beneficiary of the Harmony Clause in Conduent's contract with the Agencies. The Harmony Clause expressly identifies and is designed to protect the "other" contractor — TTEC — and creates a direct obligation running from Conduent to TTEC. The clause was included specifically to govern the inter-contractor relationship and to ensure that each contractor bears the costs its failures impose on the other.

49. The Agencies intended TTEC to benefit from Conduent's Harmony Clause obligations. This intent is evidenced by: (a) the express language of Article 2.05(d), which creates reciprocal responsibility between co-contractors; (b) the inclusion of the identical Harmony Clause in both TTEC's and Conduent's contracts; and (c) the Agencies' January 13, 2026 Endorsement Letter, in which the Agencies concurred with TTEC's claims and directed Conduent to negotiate an equitable resolution with TTEC.

50. Upon information and belief, the Agencies performed their obligations under their contract with Conduent. And TTEC performed its obligations under its contract with the Agencies, to the extent it was not prevented from so doing by Conduent.

51. Conversely, Conduent has breached its obligations under its contract with the Agencies by missing critical timelines for installation and operation of its Vector System and then rolling out a Vector System with numerous defects, pervasive platform outages, data failures, and operational disruptions described herein.

52. As a direct and proximate result of Conduent's breaches of its obligations under its contract with the Agencies, TTEC has suffered damages in excess of $10 million through June 2026, with damages continuing to accrue.

## COUNT II

### Tortious Interference with Contract

53. TTEC repeats and realleges each and every allegation set forth above as if fully set forth herein.

54. At all relevant times, TTEC had valid and enforceable contractual relationships with the Agencies under the Agreement, including the Customer Contact Center Agreement, Contract No. PSC-15-2982XA, and related Authority agreements.

55. Conduent had actual knowledge of TTEC's contractual relationships with the Agencies. Conduent was aware that TTEC held the front-office customer service contract for the NYCSC program, that the two contractors' operations were interdependent, and that defects in the Vector System would directly impact TTEC's ability to perform under its contract.

56. Conduent intentionally and without justification interfered with TTEC's contractual relationships with the Agencies. Under New York law, strict intent to interfere is not required. It is sufficient that Conduent acted with knowledge that interference with TTEC's contractual performance was a substantially certain consequence of its conduct, or with reckless disregard for the existence of TTEC's contractual rights.

57. Conduent's pervasive system failures, its refusal to timely remediate defects, and its failure to fulfill its operational responsibilities directly impaired TTEC's ability to meet its contractual obligations, resulting in KPI penalties, service-level adjustments, and adverse performance determinations assessed or threatened against TTEC by the Agencies.

58. Conduent knew or should have known that its back-office system was the operational foundation upon which TTEC's front-office services depended. Conduent knew or should have known that pervasive system defects would inevitably impair TTEC's performance

metrics. Despite this knowledge, Conduent deployed a system with hundreds of critical defects, failed to remediate those defects on promised timelines, and maintained a system that has generated more than 1,000 open DevOps tickets — making interference with TTEC's contracts a substantially certain, if not inevitable, result.

59. Additionally, Conduent intentionally made false representations to the Agencies regarding TTEC's performance in order to distract from Conduent's own failures. These false representations included assertions that TTEC and TTEC's customer service personnel were responsible for each of Conduent's many failures (described above). As a result, the Agencies will not uphold their contractual obligation to mediate disputes between TTEC and Conduent. Without the Agencies' involvement, Conduent has refused to cooperate with TTEC or make any meaningful efforts to resolve the issues with its back-office systems. Conduent knew or should have known that making affirmative misrepresentations to the Agencies about TTEC's performance would interfere with TTEC's contracts.

60. Conduent's interference lacked justification. Conduent had no legitimate business purpose served by deploying a defective system, failing to honor remediation commitments, refusing to compensate TTEC for documented losses, or spreading falsehoods about TTEC to the Agencies.

61. As a direct and proximate result of Conduent's tortious interference, TTEC has suffered damages including but not limited to: (a) KPI penalties and service-level adjustments assessed or threatened against TTEC; (b) direct operational costs in excess of $10 million; (c) reputational harm; and (d) impaired ability to perform and extend its contractual relationship with the Agencies.

## COUNT III

### Negligence

62. TTEC repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

63. Conduent owed TTEC a duty of care arising from the Harmony Clause (Article 2.05) in Conduent's contract with the Agencies. Article 2.05(d) expressly provides that "each contractor shall be responsible to the other" — thereby creating a specific, contractually defined duty of care running from Conduent to TTEC. Under New York law, a duty of care can arise from contractual provisions that expressly contemplate protection of specific third parties.

64. The Harmony Clause expressly governs the inter-contractor relationship between Conduent and TTEC. It was specifically designed to impose upon each contractor a duty to avoid causing damage, loss, or delay to the other. This is not an incidental or aspirational provision — it creates enforceable obligations that define the standard of care each contractor owes the other.

65. Conduent breached its duty of care to TTEC by: (a) deploying the Vector System with pervasive, critical defects; (b) failing to timely remediate known system defects despite repeated commitments to do so; (c) maintaining a system that has caused recurring platform outages, data accuracy failures, and transactional errors; (d) failing to ensure adequate functionality of APIs upon which TTEC's IVR system depends; and (e) failing to complete work within the time specified for completion, causing unnecessary delays.

66. Conduent's breach of duty was the direct and proximate cause of TTEC's damages. The causal chain is clear and unbroken: Conduent's defective system generated errors, outages, and failures that directly increased call volumes, extended handle times, reduced self-service

containment, and created massive backlogs — all of which forced TTEC to incur extraordinary costs to maintain service levels.

67. As a direct and proximate result of Conduent's negligence, TTEC has suffered damages in an amount in excess of $10 million through June 2026, with damages continuing to accrue.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TTEC Government Solutions, LLC respectfully requests that this Court enter judgment against Defendant Conduent Incorporated as follows:

a. Damages in an amount not less than $10,704,083, representing TTEC's documented actual costs through June 2026, plus additional damages including, but not limited to KPI penalties, service-level adjustments, reputational harm, lost business opportunities caused by Conduent's conduct, and damages accruing after June 2026, in a total amount to be determined at trial;

c. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

d. Attorneys' fees and costs of suit to the extent permitted by law or contract;

e. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff TTEC Government Solutions, LLC hereby demands a trial by jury on all issues so triable.

Dated: July 20, 2026

Respectfully submitted,

**MCDERMOTT WILL & SCHULTE LLP**

/s/ *Todd Harrison*
Todd Harrison
Rebecca Meyer
Christopher J. Whalen
One Vanderbilt Avenue
New York, New York
Tel: (212) 547-5727
Email: tdharrison@mcdermottlaw.com
bmeyer@mcdermottlaw.com
chwhalen@mcdermottlaw.com

*Attorneys for Plaintiff*
*TTEC Government Solutions, LLC*