**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TTEC GOVERNMENT SOLUTIONS LLC,<br><br>Plaintiff,<br><br>-against-<br><br>CONDUENT STATE & LOCAL SOLUTIONS, INC.,<br><br>Defendant. | 1:26-cv-06144 (RA)<br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff TTEC Government Solutions, LLC ("TTEC"), by and through its undersigned attorneys, hereby brings this Complaint against Defendant Conduent State & Local Solutions, Inc. ("Conduent") and alleges as follows:

## INTRODUCTION

1. Historically, Conduent held the contract to operate all aspects of the New York Customer Service Center ("NYCSC") with the Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels), the New York State Thruway Authority, and the Port Authority of New York and New Jersey (collectively the "Agencies" or the "NY Tolling Authorities"). Conduent operated both the "front facing" customer service center and the "back office" management system. In or around 2018, the Agencies decided to move the front facing aspects of NYCSC to a company other than Conduent because Conduent's systems were inefficient and outdated and there was a lack of transparency from Conduent. On or about August 25, 2022, TTEC took over the front-facing customer service center.

2. Unfortunately, an aggrieved Conduent has done everything in its power to prevent TTEC from successfully executing its front-office operations contract with the Agencies. As discussed in greater detail below, TTEC's front-office operations are entirely dependent on

Conduent's back-office systems, which have been riddled with issues. For instance, Conduent has missed rollout deadlines for back-office systems, and when it finally rolled those systems out, they contained errors, defects, and deficiencies.

3. Despite these challenges, TTEC has worked tirelessly to mitigate operational disruptions, prevent unnecessary delays or diminution of services caused by Conduent, cooperate with Conduent to engender improvements to NYCSC for customers, and reach an out of court settlement to resolve its dispute with Conduent amicably.

4. In return, Conduent has denied responsibility, stalled meetings and improvements, and most egregiously, attempted to pass the buck to TTEC by contacting the Agencies and falsely claiming that TTEC has and continues to be responsible for the NYCSC program shortcomings. As a result, the Agencies have given TTEC adverse performance reviews, assessed penalties against TTEC, and have not been able to properly mediate the disputes between TTEC and Conduent, as they are required to do under their separate contracts with each of the two companies.

5. As discussed in greater detail below, Conduent recently announced that it had entered into an agreement to sell its tolling business to Quarterhill, Inc. ("Quarterhill") for $70 million (the "Quarterhill Sale"). That sale is expected to close before the end of this year. Upon information and belief, Conduent has been flouting its NYCSC obligations and stalling TTEC's efforts to collaborate and cooperate because it hopes that, soon, the Quarterhill Sale will close and it will be free of any NYCSC obligations.

6. However, as a direct and proximate result of Conduent's actions, as of June 2026, TTEC has suffered extensive, direct damages totaling over $10 million, as well as other types of damage including but not limited to reputational harm and loss of goodwill. TTEC will continue to incur damages, reputational harm, and loss of goodwill until its claims against Conduent are

resolved. And once the Quarterhill Sale closes, TTEC will be stripped of its ability to recover against Conduent, necessitating the prompt preservation of its rights through the instant lawsuit.

## PARTIES

7. Plaintiff TTEC Government Solutions, LLC is a limited liability company organized under the laws of the State of Colorado, with its principal place of business at 100 Congress Avenue, Suite #1425, Austin, TX 78701. TTEC is a leading provider of customer care and support services to various public-sector clients throughout the United States, including the State of New York. TTEC is not a citizen of the state of New York.

8. Defendant Conduent State & Local Solutions, Inc. is a corporation organized under the laws of the State of New York, with its principal place of business in the State of Maryland. Conduent is a technology services company that, as relevant here, operates back-office tolling and transaction-processing systems for public-sector clients throughout the United States.

9. Non-parties the Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels), the New York State Thruway Authority, and the Port Authority of New York and New Jersey, are the public entities that administer the NYCSC program and hold contracts with both TTEC and Conduent for separate services.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff TTEC is a citizen of Colorado and Texas. Defendant Conduent is a citizen of New York and Maryland.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. The NYCSC

program serves New York-area toll-road customers, the Agencies are headquartered in New York, ***and*** the contracts at issue govern operations performed principally within the Southern District of New York.

## FACTUAL ALLEGATIONS

### *A. The NYCSC Program and the Parties' Roles*

12. The NYCSC program provides customer-care and back-office services for electronic toll-collection customers of the NY Tolling Authorities. The program serves millions of E-ZPass, Toll-by-Mail, and congestion-pricing customers across bridges, tunnels, and highways in the New York metropolitan area.

13. Conduent previously held the entire NYCSC contract, including both front-office and back-office processes. The Agencies elected to move front-facing operations away from Conduent in 2018 because Conduent's systems were inefficient and outdated, lacked transparency, and delivered substandard customer service.

#### *i. TTEC's Customer-Care Contract*

14. Under the Customer Contact Center Agreement, Contract No. PSC-15-2982XA, together with related Authority agreements Contract Nos. C010591 and 4600025342 (collectively, the "Agreement"), TTEC holds the front-office customer service contract with the Agencies. TTEC operates the public-facing components of the NYCSC, including the customer call center, live-chat agents, IVR contact-center platform, quality systems, workforce management, reporting, and the direct interface with toll customers.

15. Under the Agreement, TTEC is required to comply with certain Key Performance Indicators (KPIs). (Agreement, Section 3A, Art. 9.6.1.) If TTEC fails to achieve those KPIs, its "invoice for the month will be adjusted" downwards. (*Id.*) Conversely, there are mechanisms in the Agreement that entitle TTEC to compensation for additional and/or out-of-scope work. The

Authorities are obligated to issue or approve "Change Notices" for any amendments to the contractually agreed scope of work, and to approve and pay for "Extra Work." (Agreement, Articles 2.14 & 2.15(a), (n).)

16. Due to the interrelationship between TTEC's and Conduent's respective contracts with the Agencies, TTEC's NYCSC performance and the scope of its obligations depend heavily on Conduent's performance. The Agreement thus requires that "[d]uring the progress of the Implementation Phase and the O&M Phase the Contractor shall … work cooperatively with other parties, including the System Contractor," *i.e.*, Conduent. (Agreement, Article 2.05.) Further, Article 2.05(d) of the Agreement specifically renders TTEC and Conduent "responsible to" one another for failures in either Party's provision of their contracted-for services as follows:

> *"Each contractor shall be responsible to the other for all damage to work, to persons or property caused to the other by their operations, and for loss caused the other due to unnecessary delays or failure to finish the Work within the time specified for completion."*

17. During negotiations with the Agency, a bidder for the customer-care center contract attempted to limit its liability to the other contractor (*i.e.*, Conduent) under this provision, to no avail. Specifically, that bidder sought to limit its obligations to Conduent to "direct damage … caused solely by their operations," but the Agency declined, evincing its desire to render the customer-care center contractor broadly liable to Conduent for any harm that the customer care center contractor's operations caused Conduent, and vice versa. (Agreement, Addendum No. 7, at Item No. 13.)

***ii. Conduent's Back-Office Contract***

18. Under Contract C010572 between Conduent and the New York State Thruway Authority (the "Conduent Contract"), Conduent holds the back-office contract and operates the "Vector Successor System" (the "Vector System"), which encompasses the core back-office

system, CRM, ERP, financial-transaction processing, DMV integrations, the customer website, mobile application, transponder ordering and delivery, billing, statement generation, and customer-service chatbots.

19. Initially, the Conduent Contract "firmly obligated" Conduent to meet, and Conduent "guarantee[d]" that it would meet, "the stipulated Go-Live Date" for its Vector System. (Conduent Contract, at Art.8.09(b).)

20. More broadly, in carrying out its obligations to the NYCSC program, Conduent agreed to "provide the Services … in a competent and professional manner, with the standard of care exercised by highly qualified professionals experienced in customer service systems similar to the Services contemplated under this Agreement." (*Id*., at Art. 2.04.) Among other Services, Conduent agreed to "provide Services to Maintain the Software … in good working order, keeping it free from defects" (*id*., at Art. 7.04(g)), and to "provide technical support and … remedy any failure, malfunction, defect or non-conformity in Software." (*Id*., at Art. 7.04(h).)

21. Moreover, Conduent expressly warranted both the Vector System and the software thereon. (*Id*., at Art. 7.04(d), (e).) Regarding the Vector System, Conduent agreed to "provide a full System warranty on all System Equipment, Hardware and Software beginning from the date of [the] Go-Live … through the end of the O&M Phase," and to "promptly repair or replace, at its own cost or expense … any unit of Equipment, Hardware, or Software" that does not comply with the contractual specifications. (*Id*., at Art. 7.04(d).) Conduent further warranted that "upon commencement of the O&M Phase and for the Contract term, … the Software and each module or component and function thereof shall," *inter alia*, "be free from defects in materials and workmanship under normal use; remain in good working order …; [and] not interfere with toll collection." (*Id*., at Art. 7.04(e)(i)-(iii).)

22. As discussed, TTEC's ability to serve NYCSC customers is entirely dependent on the adequate functioning of the Vector System administered by Conduent. The two contractors' operations are inextricably linked: when Conduent's back-office system fails, TTEC's front-office operations bear the direct and immediate consequences. Accordingly, as TTEC is required to work cooperatively with Conduent (Agreement, Article 2.05), Conduent is "required to work cooperatively with" TTEC "[d]uring the progress of the Implementation Phase and the O&M Phase." (Conduent Contract, at Art. 2.05.)

23. Not only is Conduent required to work with TTEC to ensure the success of the NYCSC program, but Conduent is directly liable to TTEC for damages that Conduent's delays and operations causes TTEC as set forth in a "Harmony Clause" that is identical to the Harmony Clause in TTEC's Agreement with the Agencies:

> *"Each contractor shall be responsible to the other for all damage to work, to persons or property caused to the other by their operations, and for loss caused the other due to unnecessary delays or failure to finish the Work within the time specified for completion."*

(*Id*., at Art 2.05(d).)

24. The Harmony Clause expressly creates reciprocal obligations between Conduent and TTEC as co-contractors on the NYCSC program. It was specifically designed to ensure that each contractor bears responsibility for any harm its operations cause to the other contractor. Accordingly, while the Conduent Contract disclaims general third-party liability as to other third parties, the Harmony Clause specifically enables TTEC to enforce its rights against Conduent as a third-party beneficiary.

*25.* In addition to bearing direct contractual liability to TTEC under the Harmony Clause, Conduent is specifically required – in a very broadly-worded clause – to "indemnify and save harmless" TTEC as follows:

> *"to the fullest extent permitted by law from loss and liability upon any and all claims, suits, actions, damages, liabilities, fines, forfeitures, demands, losses, judgments, costs of every kind and nature, and every name and description including but not limited to attorneys' fees, and expenses, arising out of or in any way connected to or alleged to arise out of or to be in any way connected with the Contract and all other Services and activities of the Contractor under this Contract"*

(*Id.,* at Art. 7.02(a).) "[T]he rights and remedies provided" in Article 7.02 concerning liability and indemnification are expressly "not [] exclusive and are in addition to any other rights and remedies provided by law or this Agreement." (*Id*., at Art. 7.02(e).) These clauses were clearly written to be as expansive as possible with regard to Conduent's liability to TTEC.

### *B. Conduent Repeatedly Breaches Its Contract with the Agencies*

26. The original implementation date or "Go-Live Date" ("go-live") to serve New York toll-road customers for the Vector System was January 29, 2024. TTEC's customer service platform was ready by that date. Conduent's Vector System was not. Conduent's failure to deliver the Vector System on time delayed the program's rollout by more than one year.

27. During the workaround period from approximately February 3, 2024, to April 15, 2025, TTEC was forced to operate on Conduent's outdated legacy system because Conduent could not deliver its replacement, as it was contractually obligated to do. TTEC had to quickly train its staff to use Conduent's legacy customer service center system.

28. Conduent's Vector System finally went live on April 15, 2025. Because Conduent still did not have its Vector System fully ready for deployment at that time, almost immediately, the system was plagued by pervasive defects that far exceeded any reasonable post-implementation expectations. These defects have persisted continuously since go-live and remain substantially unresolved.

29. The Vector System's known defects include, but are not limited to: (a) billing errors, including E-ZPass transactions being mis-posted to Toll-by-Mail accounts, resulting in customer overcharges; (b) chronic transponder and tag delivery failures; (c) customer-service chatbots that cannot handle even basic prompts, pushing inquiries to TTEC's live agents; (d) violation notices erroneously reflecting thousands of dollars in tolls; (e) incorrect congestion-pricing assessments; (f) failure to process customer toll payments, placing accounts in delinquency; (g) data that was not properly migrated and remains inaccessible or unreliable; and (h) incorrect issuance of vehicle tags to motorcycle applicants.

30. The system has also experienced recurring platform outages, transactional data accuracy failures, customer mailing delays, and missed resolution timelines. As of the filing of this Complaint, over 1,000 DevOps tickets[1] remain open, with approximately 600 classified as Critical. There has been no meaningful burndown improvement since the Vector System's go-live.

31. Hundreds of thousands of customers have been unable to use IVR self-service since August 2025 due to Conduent API socket timeouts.[2] This failure has forced hundreds of thousands of additional calls to TTEC's live agents.

32. TTEC had to work with Conduent to identify temporary workarounds to allow TTEC to operate its new customer service center system to take calls and assist customers. To date, TTEC agents are unable to answer certain customer questions because certain components

---

[1] DevOps tickets are electronic logs that are submitted to Conduent when an issue with Conduent's Vector System, website, or mobile app is identified. A DevOps ticket is left "open" until the issue is resolved. "Critical" DevOps tickets are issues whose resolution is expected to be prioritized and expedited because these issues have a greater impact on NYCSC customers.

[2] When a customer calls the NYCSC, they will be initially directed to an IVR self-service, which is an automated system relying on artificial intelligence to intake and potentially resolve a customer's inquiry, instead of a live agent. TTEC administers the IVR self-service for the NYCSC, but this service relies on data relating to the customer from Conduent's Vector System to work properly. When the IVR self-service system is unable to obtain this data the Vector System, as is the case here, the IVR self-service system cannot handle the customer's inquiry, and the customer's call will be directed to a TTEC live agent.

of Conduent's Vector System still do not function properly. Further, TTEC cannot access certain data because it was not properly migrated over to the Vector System, which was Conduent's responsibility.

### *C. Conduent's Breaches of Contract Cause Operational Impact on TTEC*

33. The Vector System's failures have had a material and devastating impact on TTEC's operations. Call volumes have exceeded forecasts by approximately 160%. In February 2026 alone, TTEC received hundreds of thousands of calls — an approximately 54% increase over forecast.

34. For example, customer billing errors caused by defects in the Vector System have led to incorrect compounding charges to certain E-ZPass customer accounts. When certain E-Z-Pass customers have driven through a toll zone, their toll transaction is incorrectly posted to a Toll-by-Mail Account instead of correctly being posted to that customer's E-ZPass account. The Vector System then charges the E-ZPass customer through the Toll-by-Mail process, which charges the customer more. The tolls are not posted to the customer's E-ZPass account, so the customer is unaware of when the tolls are due for payment or how the toll should be paid. TTEC remedies the issue by moving the toll transaction to the proper account and waiving fees. However, TTEC cannot solve the underlying problems with the Vector System, which is responsible for the issues in the first instance.

35. As an additional example, defects in the Vector System cause customers to never receive their E-ZPass tags, which then requires TTEC to manually adjust their tolls until the tag is received. TTEC can remedy customer issues through fee adjustments, but it cannot resolve the root cause of overcharges to the customer.

36. Because of the unnaturally high call volumes caused by the Vector System's errors, TTEC's case backlog exceeded hundreds of thousands of cases by November 6, 2025. Between

May 8 and August 8, 2025, TTEC opened hundreds (or more) DevOps tickets identifying Vector System defects, in addition to 130 prior punch-list items.

37. Because of the overwhelming number of problems with Conduent's systems, TTEC personnel have continually been forced to incur thousands of man-hours in an attempt to help Conduent solve its problems. TTEC personnel have routinely been required to attend daily Conduent "SWAT team" meetings lasting several hours. Containment rates[3] fell to approximately 48% against a 70% target, with the 22-percentage-point miss directly attributable to Conduent's defects.

38. TTEC has been forced to staff an average of at least 940 full-time equivalent employees against an original target of 430 — more than double the planned workforce — solely to manage the consequences of Conduent's system failures. This has had dire financial repercussions for TTEC.

39. For all of the aforementioned reasons, the Authorities should have processed change orders, and paid TTEC for the extra-contractual work it had to perform because of Conduent. The Authorities have not. And that, too, is because of Conduent's interference.

40. Conduent intentionally made false representations to the Agencies regarding TTEC's performance in order to distract them from Conduent's own failures. These false representations included assertions that TTEC and TTEC's customer service personnel were responsible for each of Conduent's many failures (described above).

41. Accordingly, the Authorities have breached several provisions of their Agreement with TTEC as a direct result of Conduent's intentional and unjustifiable interference with the same.

---

[3] "Containment rates" is a metric that is meant to measure how effectively TTEC's and Conduent's systems are resolving customers' concerns without a live agent's involvement.

### *D. TTEC's Harmony Clause Claims and Conduent's Refusal to Pay*

42. On November 20, 2025, TTEC submitted its first Harmony Clause claim to Conduent for hundreds of thousands of dollars in correspondence backlog costs.

43. On December 1, 2025, TTEC submitted a comprehensive Harmony Clause claim to Conduent for millions of dollars in costs incurred and projected from April 2025 through March 2026.

44. On January 13, 2026, the Agencies issued a formal Endorsement Letter concurring with TTEC's claims against Conduent. The Agencies confirmed that, under Article 2.05(d), "[e]ach contractor shall be responsible to the other for all damage to work . . . caused to the other by their operations, and for loss caused the other due to unnecessary delays or failure to finish the Work within the time specified for completion." The Agencies directed Conduent to negotiate an equitable resolution with TTEC.[4]

45. Despite the Agencies' endorsement and direction, Conduent engaged in a pattern of delay and deflection. TTEC and Conduent attended multiple meetings between December 2025 and March 2026. At a meeting in or around February 23, 2026, Conduent promised a resolution "within a week." Conduent failed to provide any substantive response until April 9, 2026.

46. On April 9, 2026, Conduent issued a formal denial, calling TTEC's documented claims "baseless" and refusing to reimburse any amount.

47. On May 12, 2026, TTEC submitted an updated Harmony Clause claim to Conduent reflecting millions of more dollars in actual costs through March 31, 2026. This amount continues to accrue every day.

---

[4] The Agencies' January 13, 2026 formal Endorsement Letter is attached hereto as Exhibit A.

48. As of June 2026, TTEC has absorbed over $10 million in damages caused directly by Conduent's system failures.

49. To date, Conduent has refused to pay TTEC's claims. TTEC's losses continue to accrue.

### *E. Conduent Has Delayed Resolution of TTEC's Claims Due to a Pending $70 million Sale of Conduent's Tolling Business to Quarterhill, Inc.*

50. Since Conduent issued a formal denial of TTEC's Harmony Claim on April 9, 2026, TTEC has endeavored to amicably resolve its claims against Conduent.

51. TTEC and Conduent executives have engaged in several discussions concerning an out-of-court resolution of TTEC's claims. Nonetheless, no resolution has been achieved.

52. Conduent has agreed to multiple deadlines to provide TTEC with a reasonable settlement offer. Conduent has missed every single one of these deadlines.

53. On June 30, 2026, Conduent announced that it had entered into an agreement to sell its tolling business to Quarterhill for $70 million (*i.e.*, the Quarterhill Sale). According to Conduent, "this transaction is expected to close before the end of 2026."[5]

54. Upon information and belief, Conduent's involvement with NYCSC will cease following the completion of the Quarterhill Sale and Quarterhill will assume all of Conduent's responsibilities relating to NYCSC, but not its liabilities arising out of Conduent's NYCSC operations.

55. In light of Conduent's failure to meet any of its settlement offer deadlines and the pending Quarterhill Sale, TTEC believes that Conduent has been engaging in settlement

---

[5] *Conduent Announces Agreement to Sell Its Tolling Business to Quarterhill Inc. for $70 Million*, CONDUENT, https://www.news.conduent.com/news/conduent-announces-agreement-to-sell-its-tolling-business-to-quarterhill-inc-for-70-million (June 30, 2026).

discussions with TTEC solely to delay litigation or resolution of TTEC's claims before the Quarterhill Sale's completion.

56. Upon information and belief, when the Quarterhill Sale closes, TTEC will be unable to pursue its claims against Conduent, necessitating the filing of the instant lawsuit.

**COUNT I**

**Breach of Contract to Which TTEC is an Intended Third-Party Beneficiary (Monetary Damages)**

57. TTEC repeats and realleges each and every allegation set forth above as if fully set forth herein.

58. The Conduent Contract is a valid and legally enforceable contract.

59. TTEC is an intended third-party beneficiary of the Conduent Contract. Through the Harmony Clause, Article 2.05(d), Conduent assumed an express obligation to be "responsible to" TTEC "for all damage to work, to persons or property caused to [TTEC] by [Conduent's] operations, and for loss caused [TTEC] due to unnecessary delays or failure to finish the Work within the time specified for completion." The Harmony Clause expressly identifies and is designed to protect the "other" contractor — TTEC — and creates a direct obligation running from Conduent to TTEC. The clause was included specifically to govern the inter-contractor relationship and to ensure that each contractor bears the costs its failures impose on the other.

60. Indeed, the Agencies intended TTEC to benefit from Conduent's Harmony Clause obligations. This intent is evidenced by: (a) the express language of Article 2.05(d), which creates reciprocal responsibility between co-contractors; (b) the inclusion of the identical Harmony Clause in both TTEC's and Conduent's contracts; (c) the Agencies' refusal to narrow the scope of the contractors liability to one another during the contract negotiation phase; and (d) the Agencies'

January 13, 2026 Endorsement Letter, in which the Agencies concurred with TTEC's claims and directed Conduent to negotiate an equitable resolution with TTEC.

61. Accordingly, under New York law, TTEC has standing to enforce the Conduent Contract as a third-party beneficiary because: (a) the Harmony Clause manifests a clear intent to permit enforcement of the Conduent Contract by TTEC; and (b) the Harmony Clause demonstrates that the parties intended to give TTEC the benefit of Conduent's promised performance.

62. Upon information and belief, the Agencies performed their obligations under their contract with Conduent. And TTEC performed its obligations under its contract with the Agencies, to the extent it was not prevented from so doing by Conduent.

63. Conversely, Conduent has materially breached its obligations under its contract with the Agencies by, *inter alia*:

a. failing to "deliver[] to the Authority Deliverables on a timely basis," (Conduent Contract, at Art. 8.01(a)(ii)), including by failing to "within 730 days from the date of the Notice to Proceed … achieve Go-Live" (*id*., at Art. 8.09(a))—a deadline Conduent was "firmly obligated" to meet and which Conduent "guarantee[d]" that it would meet (*id*., at Art. 8.09(b));

b. delivering Software/Equipment that "prove[d] incapable of meeting the functional and/or performance requirements set forth in the Agreement" (*id*., at Art. 8.01(a)(iii));

c. failing to "provide Services to Maintain the Software … in good working order, keeping it free from defects" (*id*., at Art. 7.04(g));

d. failing to "provide technical support and … remedy any failure, malfunction, defect or non-conformity in Software." (*id*., at Art. 7.04(h));

e. failing to "provide the Services … in a competent and professional manner, with the standard of care exercised by highly qualified professionals experienced in customer service systems similar to the Services contemplated under this Agreement." (*id*., at Art. 2.04); and

f. demonstrating "a pattern of repeated failures to meet the performance standards" (*id*., at Art. 8.01(a)(xiv)).

64. As a direct and proximate result of Conduent's breaches of its obligations under its contract with the Agencies, TTEC has suffered damages in excess of $10 million through June 2026, with damages continuing to accrue.

**COUNT II**

**Breach of Warranty (Specific Performance)**

65. The Conduent Contract is a valid and legally enforceable contract.

66. For the reasons discussed above, TTEC is an intended third-party beneficiary of the Conduent Contract.

67. Upon information and belief, the Agencies performed their obligations under their contract with Conduent, and TTEC performed its obligations under its contract with the Agencies, to the extent it was not prevented from so doing by Conduent.

68. Conversely, Conduent has materially breached the warranties it expressly agreed to provide, including but not limited to its obligations to:

a. "provide a full System warranty on all System Equipment, Hardware and Software beginning from the date of [the] Go-Live … through the end of the O&M Phase," and to "promptly repair or replace, at its own cost or expense … any unit of

Equipment, Hardware, or Software" that does not comply with the contractual specifications. (Conduent Contract, at Art. 7.04(d)); and

b. "upon commencement of the O&M Phase and for the Contract term, … the Software and each module or component and function thereof shall," *inter alia*, "be free from defects in materials and workmanship under normal use; remain in good working order …; [and] not interfere with toll collection." (*Id*., at Art. 7.04(e)(i)-(iii).)

69. TTEC and the NYCSC program more broadly have suffered extensive damages as a result of Conduent's failures to uphold its warranty obligations. Thus, TTEC is entitled to an order compelling Conduent to (1) promptly repair or replace any components of the Vector System that are not functioning at the level required by the contractual specifications, (2) repair the Software and each module or component and function thereof that is defective, not in good working order, and interfering with toll collection.

**COUNT III**

**Tortious Interference with Contract**

70. TTEC repeats and realleges each and every allegation set forth above as if fully set forth herein.

71. At all relevant times, TTEC had valid and enforceable contractual relationships with the Agencies under the Agreement, including the Customer Contact Center Agreement, Contract No. PSC-15-2982XA, and related Authority agreements.

72. Conduent had actual knowledge of TTEC's contractual relationships with the Agencies. Conduent was aware that TTEC held the front-office customer service contract for the

NYCSC program, that the two contractors' operations were interdependent, and that defects in the Vector System would directly impact TTEC's ability to perform under its contract.

73. Conduent intentionally and without justification interfered with TTEC's contractual relationships with the Agencies. Under New York law, strict intent to interfere is not required. It is sufficient that Conduent acted with knowledge that interference with TTEC's contractual performance was a substantially certain consequence of its conduct, or with reckless disregard for the existence of TTEC's contractual rights.

74. Conduent's pervasive system failures, its refusal to timely remediate defects, and its failure to fulfill its operational responsibilities directly impaired TTEC's ability to meet its contractual obligations, resulting in KPI penalties, service-level adjustments, and adverse performance determinations assessed or threatened against TTEC by the Agencies.

75. Conduent knew or should have known that its back-office system was the operational foundation upon which TTEC's front-office services depended. Conduent knew or should have known that pervasive system defects would inevitably impair TTEC's performance metrics. Despite this knowledge, Conduent intentionally deployed a system with hundreds of critical defects, failed to remediate those defects on promised timelines, and maintained a system that has generated more than 1,000 open DevOps tickets — making interference with TTEC's contracts a substantially certain, if not inevitable, result.

76. Additionally, Conduent intentionally made false representations to the Agencies regarding TTEC's performance in order to distract from Conduent's own failures. These false representations included assertions that TTEC and TTEC's customer service personnel were responsible for each of Conduent's many failures (described above).

77. As a direct result of Conduent's interference, the Agencies have committed several breaches of their Agreement with TTEC including but not limited to breaches of:

a. Article 2.15 of the Agreement by failing to process, negotiate, approve, and pay amounts due under TTEC's pending Change Order Requests that were necessitated by Conduent's performance failures;

b. Articles 2.14 and 2.15 of the Agreement through continued withholding of compensation owed for Extra Work (as described in the Extra Work Directive), Disputed Work, and Conduent-caused mitigation work that had to be performed by TTEC; and

c. Article 2.05 (Harmony) of the Agreement by failing to administer and enforce that provision so that Conduent bears the losses its operations caused to TTEC.

78. Moreover, the Agencies breached Article 9.6 of the Agreement by improperly assessing and/or threatening assessment of service-level invoice adjustments, KPI penalties, offsets, and other payment reductions against TTEC for performance deficiencies caused by Conduent and other third parties outside TTEC's control, as well as Article 9.3 of the Agreement by failing to classify Conduent-caused performance impacts as Non-Chargeable Failures.

79. Conduent knew or should have known that making affirmative misrepresentations to the Agencies about TTEC's performance would interfere with TTEC's contracts.

80. Conduent's interference lacked justification. Conduent had no legitimate business purpose served by deploying a defective system, failing to honor remediation commitments, refusing to compensate TTEC for documented losses, or spreading falsehoods about TTEC to the Agencies.

81. As a direct and proximate result of Conduent's tortious interference, TTEC has suffered damages including but not limited to: (a) KPI penalties and service-level adjustments assessed or threatened against TTEC; (b) direct operational costs in excess of $10 million; (c) reputational harm; and (d) impaired ability to perform and extend its contractual relationship with the Agencies.

**COUNT III**

**Negligence**

82. TTEC repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

83. Conduent owed TTEC a duty of care arising from the Harmony Clause (Article 2.05) in Conduent's contract with the Agencies. Article 2.05(d) expressly provides that "each contractor shall be responsible to the other" — thereby creating a specific, contractually defined duty of care running from Conduent to TTEC. Under New York law, a duty of care can arise from contractual provisions that expressly contemplate protection of specific third parties.

84. The Harmony Clause expressly governs the inter-contractor relationship between Conduent and TTEC. It was specifically designed to impose upon each contractor a duty to avoid causing damage, loss, or delay to the other. This is not an incidental or aspirational provision — it creates enforceable obligations that define the standard of care each contractor owes the other.

85. Conduent breached its duty of care to TTEC by: (a) deploying the Vector System with pervasive, critical defects; (b) failing to timely remediate known system defects despite repeated commitments to do so; (c) maintaining a system that has caused recurring platform outages, data accuracy failures, and transactional errors; (d) failing to ensure adequate

functionality of APIs upon which TTEC's IVR system depends; and (e) failing to complete work within the time specified for completion, causing unnecessary delays.

86. Conduent's breach of duty was the direct and proximate cause of TTEC's damages. The causal chain is clear and unbroken: Conduent's defective system generated errors, outages, and failures that directly increased call volumes, extended handle times, reduced self-service containment, and created massive backlogs — all of which forced TTEC to incur extraordinary costs to maintain service levels.

87. As a direct and proximate result of Conduent's negligence, TTEC has suffered damages in an amount in excess of $10 million through June 2026, with damages continuing to accrue.

**COUNT IV**

**Indemnification**

88. TTEC repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

89. The Conduent Contract is a valid and binding contract.

90. Under the Conduent Contract, Conduent expressly agreed to "indemnify and save harmless" TTEC "to the fullest extent permitted by law from loss and liability upon any and all claims, … damages, … demands, losses, … costs of every kind and nature, … including but not limited to attorneys' fees, and expenses, arising out of or in any way connected to or alleged to arise out of or to be in any way connected with the Contract and all other Services and activities of the Contractor under this Contract." (Conduent Contract, at Art. 7.02.)

91. TTEC is entitled to indemnification for Conduent's deficient and negligent performance of Services under the Conduent Contract, which caused TTEC to suffer damages in an amount in excess of $10 million through June 2026, with damages continuing to accrue.

92. TTEC is also entitled to indemnification of the attorneys' fees and expenses it has incurred, and continues to incur, in prosecuting this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TTEC Government Solutions, LLC respectfully requests that this Court enter judgment against Defendant Conduent State & Local Solutions, Inc. as follows:

a. Damages in an amount not less than $10,704,083, representing TTEC's documented actual costs through June 2026, plus additional damages including, but not limited to KPI penalties, service-level adjustments, reputational harm, lost business opportunities caused by Conduent's conduct, and damages accruing after June 2026, in a total amount to be determined at trial;

c. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

d. Attorneys' fees and costs of suit to the extent permitted by law or contract;

e. Such other and further relief as this Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff TTEC Government Solutions, LLC hereby demands a trial by jury on all issues so triable.

Dated: October 2, 2026

Respectfully submitted,

**MCDERMOTT WILL & SCHULTE LLP**

*<u>/s/ Todd Harrison</u>*
Todd Harrison
Rebecca Meyer
One Vanderbilt Avenue
New York, New York
Tel: (212) 547-5727
Email: tdharrison@mcdermottlaw.com
bmeyer@mcdermottlaw.com

*Attorneys for Plaintiff*
*TTEC Government Solutions, LLC*